**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JAMAR WILSON,          )
                               )     Civil Action No. 15 – 1295
           *Plaintiff,*    )
                               )
v.                           )     District Judge David S. Cercone
                               )     Magistrate Judge Lisa Pupo Lenihan
BYANAHAK JIN, MIA HI PARK,   )
SERGEANT MILLER, SERGEANT   )     ECF Nos. 41, 48
MEDVEC, NEDRA GREGO, NURSE   )
EARL BLAKER, CAPTAIN        )
MITCHELL, IRMA VIHLIDAL,     )
MEDICAL VENDOR WEXFORD,    )
                               )
           *Defendants.*   )
                               )

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

For the following reasons, it is respectfully recommended that the Motion for Summary Judgment filed by Defendants Grego, Medvec, Miller, Mitchell, and Vihlidal (ECF No. 41) and the Motion for Summary Judgment filed by Defendants Drs. Jin and Park (ECF No. 48) be granted.

### II.    REPORT

Plaintiff, Jamar Wilson, is an inmate incarcerated at SCI-Greene who is proceeding *pro se* in this prisoner civil rights action. Plaintiff filed a previous lawsuit, <u>Wilson v. Gilmore</u>, CA No. 14-1654 (W.D. Pa.), which is a companion case to this case. In <u>Wilson v. Gilmore</u>, Plaintiff alleged that on September 20, 2014, his arm was broken by one corrections officer while another

1

corrections officer watched and did nothing, following which a nurse refused to treat him.  In the instant case, Plaintiff alleges that he was denied medical treatment for the fractured arm on September 20, 2014 and the following days, and that the treatment he did receive was inadequate.

Motions for Summary Judgment have been filed on behalf of Defendants Sergeant Miller, Sergeant Mevec, RN Supervisor Nedra Grego, CHCA Irma Vihlidal, and Captain Mitchell (collectively, the Commonwealth Defendants), (ECF No. 41), and Defendants Dr. Jin and Dr. Park (collectively, the Medical Defendants), (ECF No. 48).  For the following reasons, the Motions should be granted.


### A.  **Factual Background**

The parties do not dispute that Plaintiff's arm was fractured on September 20, 2013, and that the instant lawsuit deals primarily with the medical treatment of his fractured arm, beginning on September 20, 2014 and continuing over the subsequent days and weeks.  The facts surrounding the manner by which Plaintiff's arm was fractured on September 20, 2014, are disputed and are the subject of Wilson v. Gilmore, CA No. 14-1654 (W.D. Pa.).  The issues in that case will not be addressed in this Report and Recommendation.

Following an inmate on inmate assault that occurred on September 20, 2014, in which Plaintiff was a participant, Plaintiff was seen by RN Pokol.  At that time, Plaintiff complained of a bite wound on his right shoulder and his wound was cleaned and dressed.  (Corr. Def.'s Ex. 8, p.2; ECF No. 44-2, p.3.)  His medical records indicate that there were no other injuries noted or voiced by Plaintiff at that time and then he was escorted to the RHU.  (Corr. Def's Ex. 8, p.2; ECF No. 44-2, p.3.)  Plaintiff, however, claims that he told RN Pokol that the guards "messed up

his arm and that he was in much pain," but that RN Pokol did nothing and then Officers Barnhart and Gillis "hauled" him out of the examination room and escorted him to the RHU. (Pl.'s RCS ¶ 2, ECF No. 84, p.2.)

During the intake into the RHU following the assessment by medical, Plaintiff can be seen on video favoring his right arm, and heard expressing to the correctional officer performing the strip search that his right arm hurt. (Corr. Def.'s Ex. 1 at 2:57, 3:55.) Sergeant Miller, who conducted the in-processing and strip search of Plaintiff on September 20, 2014, when he entered the RHU following the assault, states that he remembered Plaintiff saying that his arm hurt. (Corr. Def.'s Ex. 3, ¶¶ 2-3; ECF No. 44-1, p.65.) He told Plaintiff that he would contact medical, (Corr. Def.'s Ex. 3, ¶ 3; ECF No. 44-1, p.65), but the record is unclear whether this actually occurred. He does recall, however, that Plaintiff was able to take his clothes off and otherwise participate in the strip search using both arms without much problem. (Corr. Def.'s Ex. 3, ¶ 3; ECF No. 44-1, p.65.)

Plaintiff was seen by RN Earl Blaker a few hours later (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4), but Plaintiff states that this was only because Captain Mitchell stopped RN Blaker in the hallway and asked that he come look at Plaintiff's arm (Pl.'s RCS ¶¶ 9, 14; ECF No. 84, pp.3, 4) (Corr. Def.'s Ex 10, p.1; ECF No. 44-2, p.50) (Corr. Def.'s Ex. 2, pp.15-16; ECF No. 44-1, pp.18-19). RN Blaker noted that Plaintiff complained that it hurt when he moved his arm a certain way, but further noted that Plaintiff was able to move his fingers, had only slight edema, and was in no apparent distress. (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4) (Corr. Def.'s Ex. 10, p.4; ECF No. 44-2, p.53). RN Blaker ordered ice for Plaintiff and told Plaintiff to elevate his arm above his heart. (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4) (Corr. Def.'s Ex. 10, p.4; ECF No. 44-2, p.53). He also told Plaintiff to complete a sick call slip to be seen on September 22,

2014, a Monday.[1]  (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4) (Corr. Def.'s Ex. 10, p.4; ECF

No. 44-2, p.53).  Plaintiff admits that RN Blaker told Captain Mitchell that his arm was "okay".

(Corr. Def.'s Ex. 10, p.1; ECF No. 44-2, p.50.)

     Sergeant Miller remembers that over the course of a few days, Plaintiff asked him several

times to contact medical for him.  (Corr. Def.'s Ex.3, ¶ 4; ECF No. 44-1, p.66.)  He also

remembers calling the medical department on Plaintiff's behalf on multiple occasions.  (Corr.

Def.'s Ex.3, ¶¶ 4-5; ECF No. 44-1, p.66.)  Sergeant Miller was told by the medical staff to tell

Plaintiff that he needed to put in a sick call slip to be seen.  (Corr. Def.'s Ex.3, ¶ 4; ECF No. 44-

1, p.65.)  However, in response to this, Plaintiff states that Sergeant Miller never called medical

on his behalf because if he would have they would have come.  (Pl.'s RCS ¶¶ 18-19; ECF No.

84, p.5.)

     Plaintiff was seen by Dr. Park on September 22, 2014, at 10:45 a.m., complaining that his

wrist was broken.  (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4.)  Dr. Park examined him, noting

that his right wrist and the distal part of his arm was swollen and tender.  Id.  Dr. Park believed

he probably had a fracture and ordered that his right forearm and wrist be X-rayed.  Id.  He also

prescribed Plaintiff Motrin 400 mg, three times a day for ten days, as well as Tylenol 500 mg

three times a day for 30 days, and that he be seen in the MD or PA line.  Id.  Plaintiff denies that

Dr. Park did anything but simply note that he was in pain and walked off telling him that he was

fine.  (Pl.'s RCS ¶ 4; ECF No. 81, p.3.)

     Plaintiff was seen by Dr. Jin, a board-certified general surgeon, on September 24, 2014 at

3:15 p.m.  (Corr. Def.'s Ex. 8, p.3A; ECF No. 44-2, p.5.)  Dr. Jin noted that he had a non-

displaced fracture of the distal 1/3 of his right ulna, which appeared to have occurred a few days

---

[1] According to Defendants, there were no physicians available at that time of night.

prior during an altercation. Id. Dr. Jin noted that he reviewed the X-ray, and that he had Plaintiff brought to medical from the RHU. Id. He examined him and found no sign of swelling or deformity, nor any neurovascular changes. Id. His assessment was a non-displaced fracture of the distal 1/3 shaft of the right ulna. Id. He applied a long arm cast, and had a second X-ray taken to assure that the bone was in good position.[2] Id. Dr. Jin instructed Plaintiff to keep the cast dry and clean for six weeks. (Corr. Def.'s Ex. 8, p.18; ECF No. 44-2, p.21.) He ordered a plastic bag for use while showing to keep it dry. Id. He also ordered a repeat X-ray in four weeks, and an arm sling in six weeks. Id. With respect to this visit, Plaintiff states that Dr. Jin refused to send him to an Orthopedist in order to save money and to cover up the fact that he sat for four days without medication or treatment. (Pl.'s RCS ¶ 5; ECF No. 81 at p.3.)

The first X-ray report from the radiologist on September 24, 2013, was interpreted by radiologist Dr. Michael Hinz of Mobilex and reported at 5:23 p.m. Dr. Hinz reported finding an acute fracture of the distal ulna with mild displacement. (Corr. Def.'s Ex. 8, p.35; ECF No. 44-2, p.38.)

Less than twenty minutes later, a second X-ray report was provided by Dr. Jason Liu of Mobilex. This report noted a fracture of the distal ulna without displacement in a cast. (Corr. Def.'s Ex. 8, p.36; ECF No. 44-2, p.39.)

Plaintiff was next seen on September 29, 2014 by Dr. Park. (Corr. Def.'s Ex. 8, p.3A; ECF No. 44-2, p.5.) Dr. Park noted that Plaintiff was complaining of severe pain, even in the cast, and that he was feeling "clicking and popping." Id. Plaintiff believed that he needed

---

[2] Plaintiff claims that Dr. Jin felt up and down his arm and when he got to where the bone was protruding he "maliciously and sadistically" cracked the bone back into place. (Pl.'s RCS ¶ 5; ECF No. 81, p.3.) While there is no indication in the medical records that Dr. Jin set the bone in place (reduced the fracture) it is clear that this is what Plaintiff is describing, and Plaintiff insists that it was cruel and unusual punishment and the equivalent of performing surgery without his consent.

hospital care and medication.  Id.  Dr. Park noted that he examined Plaintiff's arm again, and noted that Dr. Jin had put it in a cast on September 24, 2014, with X-rays subsequently showing reduction of the displacement.  Id.  Despite Plaintiff's insistence, Dr. Park felt that no hospital care was necessary.  Id.  He reiterated his pain medication order for Motrin and Tylenol, and extended the duration of the medication orders.  Id.

Plaintiff was next seen in follow up by Dr. Jin on October 16, 2014.  (Corr. Def.'s Ex. 8, p.3B; ECF No. 44-2, p.6.)  Dr. Jin noted that Plaintiff was still wearing the long arm cast applied on September 24, 2014, and that it appeared to be dry and clean.  Id.  Plaintiff was still having pain, and was questioning whether he should be seen by an outside doctor.  Id.  Dr. Jin observed no swelling, with good range of motion.  Id.  Plaintiff said he thought the cast seemed loose for the past few days, but Dr. Jin's assessment was a clinically stable fracture with cast.  Id.  He noted that he explained to Plaintiff that they would do a repeat X-ray next week and follow-up thereafter.  Id.  Dr. Jin ordered a follow-up X-ray on October 20, 2014, and noted that he would do a "wet read."  (Corr. Def.'s Ex. 8, p.19; ECF No. 44-2, p.22.)  While Plaintiff admits that Dr. Jin paid him a visit on October 16, 2014, he denies that Dr. Jin did any kind of assessment.  (Pl.'s RCS, ¶ 9, ECF No. 81, p.6.)  He also says that Dr. Jin denied his request for a consult with an Orthopedist.  Id.

On October 20, 2014, a follow-up X-ray was taken of Plaintiff's right arm, which was interpreted by Mobilex radiologist Reono Bertagnolli, M.D.  Dr. Bertagnolli reported finding a fracture of the distal ulna with mild angulation and interval healing compared with the September 24, 2014 X-rays.  His impression was "casted healing right forearm fracture."  (Corr. Def.'s Ex. 8, p.34; ECF No. 44-2, p.37.)

On October 23, 2014, Dr. Jin saw Plaintiff again, at his cell door in the RHU. (Corr. Def.'s Ex. 8, p.4; ECF No. 44-2, p.7.) He noted that the cast was intact, and that Plaintiff did not complain of too much discomfort. Id. He also noted that he explained to Plaintiff that the follow-up X-ray had shown that his fracture was healing properly, and that he wanted to change the cast next week to a short arm cast. Id. Dr. Jin's assessment was a healing fracture of the distal ulna. Id. In his orders, Dr. Jin directed that Plaintiff be put on his line for next Wednesday, and to have him brought to the POC in the Infirmary to have his cast-off and get an X-ray. (Corr. Def.'s Ex. 8, p.19; ECF No. 44-2, p.22.)

On October 29, 2013 (the following Wednesday), Plaintiff was brought to the Infirmary and seen by Dr. Jin. (Corr. Def.'s Ex. 8, p.4; ECF No. 44-2, p.7.) Dr. Jin noted that Plaintiff's long-arm cast was removed and that he was to be re-X-rayed. Id. Dr. Jin noted at 8:30 a.m. that he examined Plaintiff's arm, and noted that he had good elbow extension and flexion, with some limitation to pronation and supination with a painful fracture site. Id. He noted that he would evaluate him again after the X-ray. Id. Plaintiff complains that during this visit with Dr. Jin, Dr. Jin "took Plaintiff's arm and tried compelling it in ways it would not go even when Plaintiff was screeching and telling him to stop because it hurted (sic) and will not go." (Pl.'s RCS, ¶ 12; ECF No. 81, p.7.)

That same day, October 29, 2014, another X-ray was taken of Plaintiff's right forearm and interpreted by Mobilex radiologist Dr. Sonja Schaffer. Dr. Schaffer reported finding stable alignment of fracture fragments, noting that the cast has been removed in those images. (Corr. Def.'s Ex. 8, p.33; ECF No. 44-2, p.36.)

At 1:40 p.m. the same day, Dr. Jin made another progress note. (Corr. Def.'s Ex. 8, p.5; ECF No. 44-2, p.8.) He wrote that after reviewing the X-ray it showed a progressively healing

fracture with minimal angulation with callus formation.  Id.  His arm was tender over the fracture site.  Id.  He wrote that he explained to Plaintiff that he would apply a short arm cast for 2-3 weeks until his arm had further healed.  Id.  Dr. Jin noted that Plaintiff then asked him if he was qualified to do this, and that he told him yes, he had been doing this kind of work for years, including orthopedic issues, etc.  Id.  Dr. Jin noted that he tried to complete the cast application but that Plaintiff refused to let him finish.  Id.  Dr. Jin ordered that Plaintiff stay in the Infirmary POC at least overnight, as he did not want to release him without a cast.  (Corr. Def.'s Ex.8, 20; ECF No. 44-2, p.23.)  In the orders, Dr. Jin directed 23 hour observation.  Id.  Plaintiff maintains that he refused to let Dr. Jin apply the cast because "he again tried to force [his] arm and hand in ways they wouldn't."  (Pl.'s RCS, ¶ 14; ECF No. 81, p.8.)

By 2:53 p.m. the same day, Dr. Jin noted that Plaintiff had changed his mind and would let Dr. Jin put on a cast.  (Corr. Def.'s Ex. 8, p.6; ECF No. 44-2, p.9.)  Dr. Jin noted that Plaintiff thought his cast was too tight, so Dr. Jin noted he removed it and reapplied a short arm cast with fiberglass.  Id.  He explained to Plaintiff that he needed to keep the cast on for the next 2-3 weeks.  Id.  In the orders, Dr. Jin wrote that he could be discharged from the Infirmary to his cell, that he was to continue using an arm sling, and that he would be scheduled for Dr. Jin's line in one week to recheck the cast.  (Corr. Def.'s Ex.8, p.20; ECF No.44-2, p.23.)

On October 31, 2014, RN Susan Zuchowsky saw Plaintiff, noting that he had been complaining about right arm pain, and that she went to see him at the request of the CHCA. (Corr. Def.'s Ex.8, pp.6-7; ECF No. 44-2, pp.9-10.)  She found his fingers pink and warm, with good movement with his cast on.  Id.  He complained of pain over the lateral aspect of his right lower arm approximately four inches from his wrist, at the site of his fracture.  Id.  Plaintiff told her that he wanted an Orthopedic specialist to see him.  Id.  She noted that he rated his pain at a

"9" but that he was not taking his medications as prescribed.  Id.  He had finished taking his Tylenol but had a full card of Motrin in his cell that he did not take.  Id.  RN Zuchowsky noted that she advised him to take the Motrin as directed and previously ordered, and to notify the doctors if his pain increased.  Id.  While Plaintiff admits that RN Zuchowsky saw him at his cell on October 31, 2014, he denies that she did an examination or told him to take his medication as prescribed.  (Pl.'s RCS, ¶ 16; ECF No. 81, pp.8-9.)  He also denies having medication that he did not take.  Id.

On November 10, 2014, Plaintiff was seen by Dr. Park on sick call.  (Corr. Def.'s Ex. 8, p.7; ECF No. 44-2, p.10.)  Plaintiff reported pain and numbness of his right arm.  Id.  Dr. Park noted his history of a six week old fracture of the distal ulna.  Id.  Dr. Park prescribed Motrin 400 mg, three times a day for 30 days.  Id.

On November 12, 2014, Plaintiff was seen again by Dr. Jin, who went to see him in the RHU and saw him at his cell door.  (Corr. Def.'s Ex. 8, p.7; ECF No. 44-2, p.10.)  Dr. Jin noted that the short arm cast was intact and that Plaintiff said he couldn't move his elbow and hand, after which Dr. Jin noted simply "(?)."  Id.  Dr. Jin noted that X-rays to date had revealed no significant pathology of his wrist or elbow except for the ulnar fracture, and he ordered a repeat X-ray and removal of his cast.  (Corr. Def.'s Ex. 8, p.21; ECF No. 44-2, p.24.)

On November 13, 2014, Plaintiff's arm was re-X-rayed, including his elbow, which was interpreted by Mobilex radiologist Yasser Mir, M.D.  Dr. Mir reported abnormalities of the elbow.  In the right forearm, he found a healing transverse mildly angulated distal ulnar shaft fracture compared with the last X-ray of October 29, 2014.  (Corr. Def.'s Ex. 8, p.32; ECF No. 44-2, p.35.)

Dr. Jin saw him the same day, November 13, 2014, noting that he took Plaintiff's cast off and had it re-X-rayed.  (Corr. Def.'s Ex. 8, p.8; ECF No. 44-2, p.11.)  Dr. Jin then examined him. Id.  He found that Plaintiff could extend his arm to thirty degrees back to full extension and was able to pronate and supinate somewhat without pain.  Id.  He noted atrophic change of his forearm muscles with no deformity.  Id.  He was still possibly tender at the site of the fracture. Id.  Dr. Jin's impression was a healing fracture of the right ulna distal third, and he ordered to have him evaluated by physical therapy.  (Corr. Def.'s Ex. 8, pp.8, 21; ECF No. 44-2, pp.11, 24.) Plaintiff claims that during this visit he could not twist his arm left or right or roll his hand upward or downward.  (Pl.'s RCS, ¶ 20; ECF No. 81, p.9.)  He also told Dr. Jin that he was in pain and that Dr. Jin smiled and told him that he could "make it worse."  Id.

On November 19, 2014, Plaintiff was seen by Dr. Paul Dascani, who noted that he wanted pain pills for his distal right radius.  (Corr. Def.'s Ex. 8, p.9; ECF No. 44-2, p.12.)  Dr. Dascani noted he was up and ambulatory, moving both arms well and using both hands.  Id.  He already had a prescription for ibuprofen.  Id.  An X-ray from October 29, 2014 showed healing callus formation, and Dr. Dascani noted that Dr. Jin had ordered physical therapy.  Id.  Dr. Dascani ordered that he could have a Ben Gay rub for pain.  Id.  Regarding this visit, Plaintiff denies using his arm and hand "well" and states that he still could not write with his right hand. (Pl.'s RCS, ¶ 21; ECF No. 81, pp.9-10.)

On November 20, 2014, Plaintiff was seen by the physical therapist, John Kushner. (Corr. Def.'s Ex. 8, pp.10, 29; ECF No. 44-2, pp.13, 32.)  He noted that Plaintiff's elbow range of motion was within normal limits.  Id.  Plaintiff had a loss of extension of five degrees, and his supination was to forty-five degrees and pronation to ninety degrees.  Id.  His wrist range of motion was to thirty degrees on flexion and extension.  Id.  His strength was 4/5.  Id.  The

physical therapist performed passive range of motion exercises and instructed him on self-stretching exercises. Id. He planned to see him again three or four more times. Id.

On November 26, 2014, Dr. Jin made a note to indicate that Plaintiff had signed up for sick call, but was not seen because he went to the yard instead. (Corr. Def.'s Ex. 8, p.10; ECF No. 44-2, p.13.) Dr. Jin noted that he was now being followed-up by physical therapy. Id.

On December 4, 2014, Plaintiff was seen again by physical therapist John Kushner. Kushner noted that he had no new complaints. (Corr. Def.'s Ex. 8, p.10; ECF No. 44-2, p.13.) He performed passive range of motion of Plaintiff's wrist and reviewed his home exercise program. Id. Plaintiff's wrist flexion and extension were improved to forty-five degrees. Id. The plan was to see him for another 2-3 visits. Id.

On December 9, 2014, Plaintiff was seen by Dr. Park on sick call, complaining of pain in his right arm. (Corr. Def.'s Ex. 8, p.11; ECF No. 44-2, p.14.) He said that it was getting worse and that physical therapy was not helping, and that he needed "strong pain pills and an orthopedic referral." Id. Dr. Park reviewed the chart, and he noted that he was on Motrin 400 mg three times a day, and had physical therapy on December 4, 2014 with an improving prognosis. Id. Dr. Park recommended that he continue physical therapy, keep taking Motrin, and referred him for Dr. Jin's line in two weeks. (Corr. Def.'s Ex. 8, pp.11, 21; ECF No. 44-2, pp.14, 24.).

On December 18, 2014, he was seen again by physical therapist John Kushner, who noted that Plaintiff complained of soreness and weakness to his arm. (Corr. Def.'s Ex. 8, p.12; ECF No. 44-2, p.15.) Kushner noted that Plaintiff's wrist flexion and extension were forty-five and forty-degrees, and also noted his range of supination and pronation. Id. Strength was

grossly 4/5.  Id.  His assessment was improved ranged of motion, and the plan was to continue seeing him for another 2-3 visits.  Id.

On December 22, 2014, Plaintiff was seen by Dr. Paul Dascani in the RHU, who noted that Plaintiff said his right arm hurt.  (Corr. Def.'s Ex. 8, p.12; ECF No. 44-2, p.15.)  Dr. Dascani wrote that he observed Plaintiff using his right hand and wrist without difficulty.  Id.  He noted that he discussed with Plaintiff the amount of time needed for it to heal and that he could not expect that it would ever be the same as a non-fractured arm.  Id.  Dr. Dascani's plan was to continue to observe.  Id.

On December 23, 2014, Dr. Jin saw Plaintiff again.  (Corr. Def.'s Ex. 8, pp.12-13; ECF No. 44-2, pp.15-16.)  He noted that he had been receiving physical therapy as well as being seen at triage in the RHU.  Id.  He complained of pain on hyperextension of his wrist.  Id.  Dr. Jin noted some lack of extension but with much improvement.  Id.  Plaintiff stated that he was still unable to fully supinate or pronate, but Dr. Jin found this difficult to evaluate because he was handcuffed.  Id.  Plaintiff had improved elbow extension and flexion.  Id.  Dr. Jin noted he had a healing fracture, and Plaintiff claimed that he was having pain.  Id.  Dr. Jin encouraged him to continue range of motion exercises which would improve his function.  Id.

On December 26, 2014, Plaintiff was seen by PA-C Esther Mattes, saying that he'd had an injection and didn't know what it was for, but said he had subsequent arm pain and stomach pain and night sweats.  (Corr. Def.'s Ex. 8, p.13; ECF No. 44-2, p.16.)  She reviewed the chart and determined that it had been a tuberculosis test, and reported to him that it had been negative. Id.

On January 9, 2015, Plaintiff was seen again by PA Esther Mattes, complaining of arm pain.  (Corr. Def.'s Ex. 8, p.14; ECF No. 44-2, p.17.)  She noted he had been seeing the physical

therapist, who said that his sessions would be extended, but that Plaintiff complained that he must do his activities of daily living with his left hand.  Id.  PA Mattes noted that she discussed it with the doctor, and then educated Plaintiff that his healing would take a while and that he needed to continue with the physical therapy program.  Id.  She ordered 600 mg of Motrin three times a day.  Id.

PA Mattes saw Plaintiff again a few days later, noting that he was angry because he had right arm pain.  (Corr. Def.'s Ex. 8, p.14; ECF No. 44-2, p.17.)  He had been going to physical therapy, and was taking Motrin.  Id.  She saw him at his cell door and noted that he had difficulty with pronation and supination of his right wrist.  Id.  Her assessment was a healing right ulnar fracture, and the plan was to continue with range of motion exercises and to consider a wrist brace if no improvement.  Id.

On January 22, 2015, Plaintiff was seen again by physical therapist John Kushner, who noted he continued to be limited with the use of his right upper extremity, and was compliant with his home exercise program.  (Corr. Def.'s Ex. 8, p.15; ECF No. 44-2, p.18.)  His right wrist flexion and extension were now sixty-five degrees, and he had improvement in pronation and supination.  Id.  He reviewed the home exercise program and performed passive range of motion. Id.  His assessment was that Plaintiff was overall improving with range of motion, and the plan was to continue the visits.  Id.

On February 5, 2015, Plaintiff was seen again by physical therapist John Kushner.  (Corr. Def.'s Ex. 8, p.15; ECF No. 44-2, p.18.)  He noted that Plaintiff had no new complaints, but reported that he felt a bump on his forearm.  Id.  Kushner noted that his flexion and extension were now improved to seventy-degrees.  Id.  He performed passive range of motion exercises. Id.  He noted he could feel a palpable nodule, possibly a callus, on the distal third of his ulna, but

that there was no palpable pain at that site.  Id.  Kushner's assessment was continued

improvement with range of motion, and that he would continue seeing him for another 2-3 visits.

Id.

Also on February 5, 2015, PA Esther Mattes noted that Plaintiff had signed up for sick

call, but he had gone to the yard instead so he was not seen.  (Corr. Def.'s Ex. 8, p.16; ECF No.

44-2, p.19.)

On February 9, 2015, Plaintiff again signed up for sick call, but again went to the yard

and was not seen.  (Corr. Def.'s Ex. 8, p.16; ECF No. 44-2, p.19.)

On February 18, 2015, Plaintiff was seen again by PA Mattes.  (Corr. Def.'s Ex. 8, p.16;

ECF No. 44-2, p.19.)  He complained of left shoulder pain and right arm pain, and said

movement caused pain in his shoulder and being still relieved the pain.  Id.  There was no

radiation.  Id.  His pain at the time was a "0."  Id.  PA Mattes noted that Plaintiff had a history of

right ulnar fracture and was in physical therapy.  Id.  PA Mattes noted that his strength was 5/5

on the left and 4/5 on the right.  Id.  Sensation, circulation, and brachial pulses were intact.  Id.

Plaintiff said that Motrin bothered his stomach.  Id.  Her orders were to continue Motrin and add

omeprazole (Prilosec).  Id.

On February 19, 2015, Plaintiff was seen by physical therapist Kushner, who noted that

he had no new complaints.  (Corr. Def.'s Ex. 8, p.16; ECF No. 44-2, p.19.)  His range of motion

was now improved to 80 degrees flexion and normal extension.  Id.  Strength was 4+ to 5/5

throughout.  Id.  He performed passive range of motion.  Id.  His assessment was continued

improvement with right wrist strength and range of motion.  Id.  His plan was to continue

physical therapy for another one to two visits.  Id.

On March 17, 2015, PA Mattes charted to renew his medications. (Corr. Def.'s Ex. 8, p.17; ECF No. 44-2, p.20.) She noted that Plaintiff was using Motrin and omeprazole and that he was out at yard. She renewed his medication orders. Id.

**B.  Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. Nat'l State Bank v. Fed.l Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing Celotex, 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963). See also Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing Celotex, supra).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c)(2); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## C. Discussion

### 1. Claims against the Commonwealth Defendants

The claims against the Commonwealth Defendants are as follows: (1) denial of access to medical care; (2) failure to intervene when the doctors allegedly did not provide medical care; and (3) intentional infliction of emotional distress.

#### a. Denial of access to medical care

Plaintiff alleges that all five Commonwealth Defendants denied him access to medical care when they "knew and understood his condition," (ECF No. 6, ¶ 163), and they "repeatedly denied [his] requests of access to medical personnel qualified to exercise judgment about [his] displaced protruding bone," (ECF No. 6, ¶¶ 169, 170).

The Eighth Amendment protects individuals against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates."

Farmer v. Brennan, 511 U.S. 825,832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

In Estelle v. Gamble, the United States Supreme Court noted that the most elementary principles underlying Eighth Amendment constitutional jurisprudence "establish the government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. 97, 103 (1976). The Estelle Court concluded that the Eighth Amendment prohibits the deliberate indifference to serious medical needs of prisoners. Id. at 104. The Court stated that a cause of action under § 1983 is thereby established "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05 (footnotes omitted).

It was not until 1994, however, in Farmer v. Brennan, that the United States Supreme Court clarified its meaning of the term "deliberate indifference." 511 U.S. 825 (1994). In Farmer, the Court held as follows:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the interference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Id. at 837-38. The Farmer Court also discussed its reasoning in Estelle, noting that negligence in diagnosing or treating the medical conditions of prisoners will not rise to the level of an Eighth Amendment violation. Farmer, 511 U.S. at 835 (quoting Estelle, 429 U.S. at 106).

Conversely, a plaintiff must also demonstrate a medical need that is objectively "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a

physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

Additionally, where a prisoner is being treated by medical personnel, non-medical prison officials cannot be deliberately indifferent for failing to intervene in the medical treatment unless that prison official has reason to believe, or actual knowledge, that prison doctors or their assistants are mistreating, or not treating, a prisoner. *See* Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (non-medical defendants not deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."); *see also* Spruill v. Gillis, 372 F.3d 236, 236 (3d Cir. 2004) ("absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.") (discussing Durmer, *supra*).

Here, none of the Commonwealth Defendants, except for Nurse Grego, are medical personnel,[3] and it is undisputed that Plaintiff was under the care of medical staff at least as of September 22, 2014, when he was seen by Dr. Park two days after he fractured his arm. Therefore, the question becomes whether any of the Commonwealth Defendants were deliberately indifferent to Plaintiff's medical needs prior to the point at which he first came under medical care.

Regarding Defendant Mitchell, Plaintiff admits that within a couple of minutes of seeing him on September 20, Defendant Mitchell got a nurse to examine him and that the nurse ordered

---

[3] CHCA Vihlidal is considered a non-medical defendant. *See* Roberts v. Tretnick, 2014 WL 4218249, at *3 (W.D. Pa. Aug. 25, 2014) (CHCA is an administrative official and subject to the limitations on suits for denial or delay of medical care against non-medical personnel).

Plaintiff an ice pack and told Mitchell that Plaintiff was "okay." (Corr. Def.'s Ex. 2, pp.15-16; ECF No. 44-1, pp.17-18.) Plaintiff complains that Defendant Mitchell saw his protruding bone and should have known that an ice pack was not a sufficient treatment for a broken arm. Id.

With regard to Defendants Miller and Medvec, Plaintiff admits that both of them advised him to submit a sick call slip, which he did, but that neither of them would get him immediate medical care for his broken arm even though he told them that it was an emergency and that he was in pain. Defendant Miller states that he remembers Plaintiff asking him several times to contact medical for his arm and that he did call medical on Plaintiff's behalf multiple occasions.[4] However, he was told by medical staff to tell Plaintiff that he needed to put a sick call slip in to be seen. (Corr. Def.'s Ex. 3; ECF No. 44-1, p.65-66.) Defendant Medvec admits that he does not remember the incident but that he would have called medical if Plaintiff faced an emergency. (Corr. Def.'s Ex. 4; ECF No. 44-1, pp.68-69.)

As previously stated, Plaintiff must prove two elements to establish an Eighth Amendment violation. First, he must show that he was suffering from a "serious medical need" during the period of time at issue, and second, he must show that the Defendants were deliberately indifferent to his serious medical need. Estelle, 429 U.S. at 106.

As to the first inquiry, the seriousness of a medical need is measured by whether it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzara, 834 F.2d 326, 347 (3d Cir. 1987). While it is undisputed that Plaintiff's arm was broken, and a broken arm may constitute a serious medical need under the law, see Vining v. Department of Correction, 2013 WL 2036325,

---

[4] While Plaintiff denies that Defendant Miller ever called medical, he admitted in his deposition that Miller told him that medical would be called and that an unknown officer (possibly CO Carter) told Miller that medical was in fact called. (Corr. Def.'s Ex. 2, pp.9-10; ECF No. 44-1, pp.11-12.) He also admitted that he did not know whether or not Miller called medical. Id.

at *4 (S.D.N.Y. Apr. 5, 2013) (collecting cases), the record suggests that Plaintiff's broken arm was not as readily apparent as he claims, *see* Durham v. Nu'Man, 97 F.3d 862, 869 (6th Cir. 1996) (while broken arm is clearly a "serious medical need," it was not readily apparent that plaintiff's arm was broken, and "so it was not unreasonable or wanton for the two physicians to fail to diagnose that it was broken until several days later"). Plaintiff claims his bone was "protruding" from his arm, but in his deposition he admitted that there was only a bump of approximately one centimeter. (Corr. Def.'s Ex. 2, pp.59-60; ECF No. 44-1, pp.61-62.) In fact, Also, Plaintiff's medical records indicate that his broken arm was not so readily apparent to the nurse who examined him within hours after entering the RHU on September 20, 2014, as the nurse indicated that he observed only "slight edema" to Plaintiff's right distal radius. (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4.) Therefore, it is possible that the Defendants were not aware of the serious nature of Plaintiff's injury.

Nevertheless, the record does not show that the Defendants acted with a sufficiently culpable state of mind as to exhibit deliberate indifference by deliberately disregarding Plaintiff's medical needs. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer, 991 F.2d at 68. "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994).

Here, Plaintiff was seen by a nurse immediately following the assault, and, according to his medical records, he did not report his arm injury at that time. Plaintiff then saw another nurse a few hours later who examined his arm and did not diagnose Plaintiff as having a serious injury that required immediate medical treatment. He noted that Plaintiff demonstrated no signs or

symptoms of acute distress and that Plaintiff was able to move his fingers of his right hand.

While Plaintiff believed that the nurse's response was inadequate, the Defendants, as non-medical professionals, were entitled to rely on and defer to the medical judgment of the nurse.

*See*, *e.g.*, Durmer, 991 F.2d 69 ("supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care.)  Moreover, they were also entitled to rely on the response by the medical department who advised Defendant Miller that Plaintiff needed to put in a sick call slip to be seen.  It appears that the delay in treatment in this case was not attributed to any of the Commonwealth Defendants, but rather medical's belief that Plaintiff was not suffering from a serious medical injury that required immediate medical attention.  Furthermore, Plaintiff has failed to point to any evidence demonstrating what lasting injury he endured due to this delay.  *See* Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (a plaintiff "who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed") (overruled on other grounds); Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1191 (11th Cir. 1994) (finding no deliberate indifference where plaintiff "submitted no medical evidence explaining how the four-hour delay in taking [him] to the hospital detrimented or worsened his medical condition") (overruled on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 (2002)); Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (*per curiam*) (while hospital records showed that arrestee displayed multiple bruises to the forehead, left ribs, right flank and left shoulder, and was suffering from abrasions to the cornea and upper back, consistent with plaintiff's allegations that he had been assaulted by police officer, there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated these injuries "in the

slightest"); Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988) (rejecting allegations of deliberate indifference arising out of alleged delay in providing medical treatment based, in part, on plaintiff's failure to produce any evidence of injury caused by the delay); Mantz v. Chain, 239 F. Supp. 486, 504 (D.N.J. 2002) (plaintiff must provide "medical evidence, beyond his own subjective testimony, that [the] alleged delay . . . caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene."); Brown v. Cohen, No. 09-2909, 2012 U.S. Dist. LEXIS 81115, at *15 (E.D. Pa. June 12, 2012) (summary judgment granted to prison officials where inmate failed to present evidence establishing that his injuries were exacerbated or caused by a delay in treatment).

The record simply does not substantiate Plaintiff's allegations of deliberate indifference against the Commonwealth Defendants. Therefore, it is recommended that summary judgment be granted to the Commonwealth Defendants as to this claim. *See*, *e.g.*, Rodriguez v. Ames, 224 F.Supp.2d 555 (W.D.N.Y. Sept. 30, 2002) (fifteen day delay in sending inmate to the emergency room for treatment of a broken hand did not constitute medical indifference); Henderson v. Doe, 1999 WL 378333, at *3 (S.D.N.Y. June 10, 1999) (no deliberate indifference when plaintiff was examined for injured finger within half-hour of incident by nurse who ordered an ice pack and placed it in a splint, and plaintiff was not given X-ray, seen by the physician or diagnosed with having a broken finger until three days later at which time it was re-wrapped and he was given pain medication).

Furthermore, insofar as Plaintiff seeks to hold the Commonwealth Defendants liable for the treatment (or lack thereof) by the medical professionals, he is likewise entitled to no relief. "The law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions

where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong." Cameron v. Allen, 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007) (citing Vinnedge v. Gibbs, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Plaintiff has presented no evidence that the Commonwealth Defendants personally participated in or had any involvement, direct or otherwise, with the medical treatment provided to him by the medical staff. The record demonstrates that medical personnel made all decisions relative to the course of treatment provided to Plaintiff and that they provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

With regard to Defendant Vihlidal, Plaintiff's claims are a bit unclear. In his Complaint, he says that after his cast was removed on November 13, 2014, Defendant Vihlidal told him that he needed to sign some forms in order to see an orthopedic. (ECF No. 6, ¶ 113.) However, when Plaintiff read the form he discovered that it was actually a form for refusal of medical care. (ECF No. 6, ¶ 115.) When Plaintiff told Vihlidal that he was not going to sign it, she allegedly responded by saying, "Mr. Wilson, you will not win." (ECF No. 6, ¶ 116.) In his deposition, Plaintiff said that she tried to trick him into signing the form. (Corr. Def.'s Ex. 2, p.34; ECF No. 44-1, p.36.)

Defendants claim that the form was actually an authorization for Plaintiff's aunt to receive information about Plaintiff's medical care, and that Defendant Vihlidal explained to Plaintiff that she could not speak with anyone regarding his medical treatment unless he gave his consent and authorization. (Corr. Def.'s Ex. 7; ECF No. 44-1, p.77; Ex. 18, p.2; ECF No. 44-2, p.112.) However, it appears to the Court that Plaintiff may be confusing this form with the

refusal of medical treatment form that he refused to sign on October 29, 2014, when Dr. Jin attempted to apply a short-arm cast on Plaintiff's arm.  (Corr. Def.'s Ex. 8, p.5; ECF No. 44-2, p.8.)  His medical records indicate that he refused to sign the refusal of medical treatment form after he prohibited Dr. Jin from applying the short-arm cast.  Id.  Nevertheless, even if Plaintiff's version of events were to be credited, he has not shown how Defendant Vihlidal's actions denied him access to medical care in any way.

Plaintiff also claims that Defendants Vihlidal and Grego are liable because they wrote misleading responses to his grievances by saying that Plaintiff had a "non-displaced fracture" when the X-ray report said that it was a "displaced fracture."  (Corr. Def.'s Ex. 2, p.36; ECF No. 44-1, p.38.)  With respect to this allegation, the Court notes that Plaintiff's initial X-ray taken on September 24, 2014 revealed a "mild displacement," and the second X-ray, taken after his arm was casted, revealed "no displacement."  (Corr. Def.'s Ex. 8, pp.35-36; ECF No. 44-2, pp.38-39.)  Therefore, their responses to his grievances were not entirely incorrect.  Nevertheless, Plaintiff has once again failed to show how their responses to his grievances denied him access to medical care.

Finally, Plaintiff claims that Defendants Vihlidal and Grego's responses to his grievances were misleading because, for example, they said that he did not need to see an outside specialist.  (Corr. Def.'s Ex. 2, p.37; ECF No. 44-1, p.39.)  However, in denying his grievances, Defendants Vihlidal and Grego were not doing anything more than reviewing medical care Plaintiff had already received and in no way were denying him access to medical care.

For all the aforementioned reasons, summary judgment should be granted in favor of the Commonwealth Defendants with respect to Plaintiff's denial of medical care claims.

### b. **Failure to intervene**

Plaintiff next claims that the Commonwealth Defendants failed to intervene "when they witness[ed] and understood Plaintiff being mistreated by medical staff and injuring him more." (ECF No. 6, ¶ 172.)  The medical records (Corr. Def.'s Ex. 8) and Plaintiff's own deposition (Corr. Def.'s Ex. 2) show that Plaintiff received extensive medical care from both Dr. Park and Dr. Jin, as well as other medical providers.  There is nothing in the record to that any of the non-medical Commonwealth Defendants (Miller, Medvec, Mithcell, or Vihlidal) or Nurse Grego, who did not treat Plaintiff, had any reason to believe that Dr. Jin and Dr. Park (or any nurse or other medical practitioner) provided constitutionally inadequate care such that they had to intervene.

For the same reasons the Commonwealth Defendants are entitled to summary judgment for the denial of medical care claims, they are also entitled to summary judgment on their failure to intervene in the medical care provided by others.

### c. **Intentional Infliction of Emotional Distress**

Plaintiff next raises a state law claim of intentional infliction of emotional distress alleging that the Commonwealth Defendants engaged in "extreme and outrageous conduct". (ECF No. 6, ¶¶ 192, 194.)  However, the Commonwealth Defendants are employees of the Commonwealth of Pennsylvania, and as such they are entitled to sovereign immunity to the extent they were acting within the scope of their duties.  *See* PA CONST. Art. 1, § 11; 1 Pa. C.S.A. § 2310.  There are nine delineated exception to sovereign immunity, 42 Pa. C.S.A. § 8522, but none of these exception apply to this case.  Additionally, there is nothing to suggest that the Commonwealth Defendants were not acting within the scope of their employment.  *See*

Mitchell v. Luckenbill, 680 F.Supp.2d 672, 682 (M.D. Pa. 2010) (identifying the requirements for an action to fall within the scope of employment under Pennsylvania law).  Therefore, they are entitled to summary judgment on this claim.

### 2.  Claims against the Medical Defendants

The claims against the Medical Defendants are as follows: (1) deliberate indifference to medical needs; (2) denial of equal protection; (3) assault and battery; and (4) intentional infliction of emotional distress.

### a.  Deliberate Indifference to Medical Needs

First, Plaintiff claims that Dr. Park was deliberately indifferent to his serious medical needs by failing to provide him with emergency medical care for his broken bone when Dr. Park saw him on September 22, 2014, and continuously denied his requests for "specialized expertise."  (ECF No. 6, ¶¶ 165-166.)  Second, he claims that Dr. Jin was deliberately indifferent to his serious medical needs by failing to provide him with "a qualified bone specialist" and choosing "a less efficacious and harmful way to treat [his] protruding, displaced bone by manually snapping it into place without consent."  (ECF No. 6, ¶ 167.)

As previously stated in this Report, "[o]nly 'unnecessary and wanton infliction of pain' or 'deliberate indifference to the serious medical needs' of prisoners are sufficiently egregious to rise to the level of a constitutional violation."  White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  The Third Circuit has stated that "deliberate indifference" requires "'obduracy and wantonness,' Whitley v. Albers, 475 U.S. 312, 319 (1986), which has been linked to conduct that includes recklessness or a conscious disregard

of a serious risk." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citing Farmer, 511 U.S. at 842).

The Third Circuit has also said that the "deliberate indifference to serous medical needs" standard is clearly met when a doctor is "intentionally inflicting pain on [a] prisoner[]." White, 897 F.2d at 109.  The court has found "deliberate indifference" in a variety of circumstances, including where the prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.2d at 197.  It has also found "deliberate indifference" to exist where the prison official persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury." White, 897 F.2d at 109-11.

Importantly, allegations of medical malpractice are not sufficient to establish a constitutional violation. See id. (citing Estelle, 429 U.S. at 106); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).  It is also well-established that "mere disagreements over medical judgment do not state Eighth Amendment claims." White, 897 F.2d at 110.  "A court may not substitute its own judgment for diagnosis and treatment decisions made by prison medical staff members." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

Plaintiff's first substantive complaints about his treatment by Drs. Park and Jin start on September 22, 2014, when he was seen by Dr. Park at his cell.  Dr. Park examined him, noting that his right wrist and distal part of his arm was swollen and tender.  He believed that Plaintiff probably had a fracture, and he ordered that his right forearm and wrist be X-rayed, prescribed him Motrin 400 mg three times a day for ten days, as well Tylenol 500 mg three times a day

for 30 days, and directed that he be seen in the MD or PA line.  (Corr. Def.'s Ex. 8, p.3; ECF No. 44-2, p.4.)  Plaintiff was seen by Dr. Jin two days later, on September 24, 2014, at which time he noted that Plaintiff had a non-displaced fracture of the distal 1/3 of his right ulna.  Dr. Jin noted that he reviewed the X-ray, and had Plaintiff brought to medical from the RHU.  He examined Plaintiff and found no sign of swelling or deformity, nor any neurovascular changes.  Dr. Jin set Plaintiff's bone in place, applied a long arm cast, and had a second X-ray taken to assure that the bone was in good position.[5]  Dr. Jin instructed Plaintiff to keep the cast dry and clean for six weeks.  He ordered a plastic bag for use while showering to keep it dry.  He also ordered a repeat X-ray in four weeks, and an arm sling in six weeks.  (Corr. Def.'s Ex. 8, pp.3A, 18; ECF No. 44-2, pp.5, 21.)

Plaintiff argues that he should have been sent to an outside hospital and received treatment from an orthopedic surgeon, instead of Drs. Park and Jin.  He claims that Dr. Park did nothing for him despite noticing that his bone was "protruding," and he simply walked off stating that he would note that Plaintiff had pain.  He claims that Dr. Jin was not qualified to set his bone in place, and that realigning his bone (which Plaintiff describes as "performing surgery") was a "less efficacious course of treatment" done only to save money and ultimately aggravated his condition and put him at risk of significant harm.  He also takes issue with the fact that Dr. Jin noted in his medical records that he had a "non-displaced" fracture when he really had a "displaced" fracture, allegedly trying to cover up the severity of his injury.  Finally, he claims that both doctors denied him effective pain medication even though he complained that he was in extreme pain and discomfort.

---

[5] According to Plaintiff's description of the encounter with Dr. Jin on September 24, Dr. Jin felt along the length of his arm, and with a quick movement, "snapped" his bone in place, which Plaintiff is angry about because he says it was painful.  He also insists that it was the equivalent of performing surgery without his consent, which he claims was cruel and unusual punishment.

The next specific complaint Plaintiff makes pertains to Dr. Jin's removal of his cast and replacement with a new cast on October 29, 2014. Specifically, he alleges that Dr. Jin tried to force his arm in a direction it would not go, and that he was deliberately indifferent by trying to harm him. The records show that before that visit occurred, Dr. Jin had seen him on two other occasions to check his progress, and had also obtained another X-ray. (Corr. Def.'s Ex. 8, pp.3B, 4, 19, 34; ECF No. 44-2, pp.6, 7, 22, 37.) On October 29, 2014, Plaintiff was brought to the Infirmary and seen by Dr. Jin. Dr. Jin removed his long arm cast and he was to be re-X-rayed. Dr. Jin noted at 8:30 a.m. that he examined Plaintiff's arm and that he had good elbow extension and flexion, with some limitation to pronation and supination with a painful fracture site. He noted that he would evaluate him again after the X-ray. (Corr. Def.'s Ex. 8, p.4; ECF No. 44-2, p.7.)

At 1:40 p.m. the same day, Dr. Jin wrote that after reviewing the X-ray it showed a progressively healing fracture with minimal angulation with callus formation. His arm was tender over the fracture site. He wrote that he explained to Plaintiff that he would apply a short arm cast for 2-3 weeks until his arm had further healed. Dr. Jin noted that Plaintiff then asked him if he was qualified to do this, and that he told him yes, he had been doing this kind of work for years, including orthopedic issues. Dr. Jin noted that he tried to complete the cast application but that Plaintiff refused to let him finish. Plaintiff refused to sign a DC-462 (refusal of recommended medical treatment) form.[6] Dr. Jin ordered that Plaintiff stay in the Infirmary POC at least overnight, as he did not want to release him without the cast. In the orders, Dr. Jin directed 23 hour observation. (Corr. Def.'s Ex.8, pp.5, 20; ECF No. 44-2, pp.8, 23.) This did not prove to be necessary, as by 2:53 p.m., the same day, Dr. Jin noted that Plaintiff had changed

---

[6] The Medical Defendants incorrectly state that Plaintiff signed this form. However, the medical records indicate that he refused to sign the form.

his mind and would let Dr. Jin put on a cast.  Dr. Jin noted that Plaintiff thought his cast was too

tight, so he removed it and reapplied a short arm cast with fiberglass.  He explained to Plaintiff

that he needed to keep the cast on for the next 2-3 weeks.  In the orders, Dr. Jin wrote that he

could be discharged from the Infirmary to his cell, that he was to continue using an arm sling,

and that he be scheduled for Dr. Jin's line in one week to recheck the cast.  (Corr. Def.'s Ex. 8,

pp.6, 20; ECF No. 44-2, p.9, 23.)

The medical records, and indeed even Plaintiff's own admissions in his Complaint, reveal

that Plaintiff received appropriate and adequate medical care for his broken arm, and the

treatment was actually quite successful.  The before and after X-rays of September 24, 2014

demonstrate that the fracture was appropriately reduced.  Plaintiff was prescribed pain

medication and he was regularly followed by medical staff.  After the second cast came off, Dr.

Jin ordered physical therapy.  Between November 2014 and February 2015, Plaintiff was treated

by the physical therapist and demonstrated regular and significant improvement in his range of

motion and strength in his right arm.

Plaintiff's personal opinions about how and where he should have received medical

treatment do not dictate the constitutional standard.  Ultimately, Plaintiff has pled nothing more

than a disagreement with the medical treatment provided to him by Drs. Jin and Park, which is

insufficient to establish deliberate indifference.  *See* White, 897 F.2d at 110.  Additionally, his

disagreement over the preferred medication used to treat his pain does not support an Eighth

Amendment claim.  *See* White, 897 F.2d at 110; Rochell v. Corr. Med. Servs., No. 4:05CV268,

2006 U.S. Dist. LEXIS 37943, at *10 (N.D. Miss. April 10, 2006) ("The constitution does not . .

. guarantee pain-free medical treatment . . . .  While the plaintiff might have preferred stronger

medication, his mere disagreement with his medical treatment does not state a constitutional

claim.")  Plaintiff is not constitutionally entitled to the treatment of his choice and it cannot be assumed that stronger pain medication would have successfully relieved his pain.  Even drawing all inference in favor of Plaintiff, the undersigned cannot conclude that there is a genuine issue of material fact for trial as to whether Drs. Jin and Park acted with deliberate indifference in connection with Plaintiff's medical treatment.  Thus, summary judgment should be granted as to this claim.

### b.  Equal Protection

Plaintiff claims that Dr. Jin violated his right to equal protection by denying him access to an orthopedic specialist because of his RHU status.  (ECF No. 6, ¶ 175.)  Specifically, he says that Dr. Jin told him on December 23, 2014, that he would not get Plaintiff an orthopedic consult at that time but that he would reconsider when Plaintiff was returned to general population.

Because Plaintiff does not allege that he was a member of a protected class, *see* Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2001) (holding that prisoners are not a suspect class), or that a fundamental right was violated, *see* City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (classifications involving suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened scrutiny), at a minimum, he must show that he was "intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment[,]" Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008).  Plaintiff, however, cannot meet this standard because RHU inmates are not similarly situated to inmates in general population.  *See* Fogle v. Pierson, 435 F.3d 1252, 1260-61 (10th Cir. 2006) (administrative segregation inmates not similarly situated to general population inmates); Muick v. Reno, 83 F. App'x 851, 854 (8th Cir.

2003) (special housing unit not similarly situated to the general population inmates); <u>Larkin v. Murphy</u>, 1993 WL 269365, at *6 (7th Cir. July 19, 1993) (inmates in segregated confinement not similarly situated to inmates in the general population); <u>Turner v. Smythe</u>, 1993 WL 137748, at *1 (9th Cir. Apr. 30, 1993) (administrative segregation inmate not similarly situated to inmates in general population).

Furthermore, it is possible that the security risk RHU inmates pose might reasonably account for any difference in treatment between general population inmates when it comes to being sent to outside specialists in non-emergency situations. *See* <u>Malmed v. Thornburgh</u>, 621 F.2d 565, 569 (3d Cir. 1980) (state action may be upheld on any valid ground, even one hypothetically posed by the court). Therefore, it is recommended that summary judgment be granted in favor of Defendants as to Plaintiff's equal protection claim.

### c.  <u>Assault and Battery</u>

Plaintiff brings a state law claim of assault and battery against Dr. Jin for performing surgery by snapping his bone back into place without being qualified to do so and without his consent.[7]  (ECF No. 6, ¶ 177.)  It is well-established in Pennsylvania that, absent an emergency, claims alleging a lack of consent for surgical or operative procedures constitute a battery committed upon a patient by a physician.[8] *See* <u>Cooper ex rel. Cooper v. Lankenau Hosp.</u>, 51 A.3d 183, 191 (Pa. 2012) ("[S]urgery performed without the patient's consent constitutes an intentional and offensive touching, and satisfies the elements of battery.") (citing <u>Montgomery v.</u>

---

[7] The undersigned puts no credence into Plaintiff's claim that Dr. Jin, who is a board-certified general surgeon, was not qualified to reduce his fracture.

[8] The Pennsylvania Supreme Court has also described operation without the patient's consent as a technical assault. *See* <u>Gouse v. Cassel</u>, 615 A.2d 331, 333-34 (Pa. 1992); <u>Gray v. Grunnagle</u>, 223 A.2d 663, 668-69 (Pa. 1966).

Bazaz-Sehgal, 798 A.2d 742, 749 (Pa. 2002); Morgan v. MacPhail, 704 A.2d 617, 620 (Pa. 1997); Gray v. Grunnagle, 223 A.2d 663, 669 (1966)).  Informed consent, however, has not been required in cases involving non-surgical procedures.  Morgan, 704 A.2d at 619.

Informed consent requires that the physician explain the risks that a reasonably prudent patient would need to know to make an informed decision.  *See* Gouse v. Cassel, 615 A.2d 331, 334 (1992) (providing that to obtain informed consent for a surgical procedure, the physician must "advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation").

In 2002, the Pennsylvania legislature codified a physician's duty to obtain informed consent in the Pennsylvania Medical Informed Consent Law, 40 P.S. § 1303.504.  The statute provides, in relevant part:

(a) Duty of physicians.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

(1) Performing surgery, including the related administration of anesthesia.

(2) Administering radiation or chemotherapy.

(3) Administering a blood transfusion.

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician

acting in accordance with accepted medical standards of medical practice would provide.

Id. § 1303.504(a)-(b). The statute further provides that "[a] physician is liable for failure to obtain the informed consent only if the patient provides that receiving such information would have been a substantial factor in the patient's decision whether to undergo a procedure set forth in subsection (a)." 40 P.S. § 1303.504(d)(1).

The current state of the law in Pennsylvania on the doctrine of informed consent is applicable only where the patient is subject to a surgical or operative procedure. Morgan, 672 A.2d at1362. The Pennsylvania Supreme Court has defined surgical procedures as those involving excision, incision or the use of surgical instruments. Morgan, 704 A.2d at 619. However, the procedure involved in this case, a closed reduction of a fracture, does not fall within the definition of surgical or operative procedure because it neither involved an excision or incision or the use of surgical instruments. Furthermore, a closed reduction does not fall within one of the procedures provided for in the Pennsylvania Medical Informed Consent Law.

The critical element of a medical battery is the lack of informed consent. If follows then that a claim for medical battery cannot lie where the medical procedure did not require the patient's informed consent. The Court finds that the medical procedure in this case did not require Plaintiff's informed consent. No matter the amount of hyperbole Plaintiff uses to describe the reduction of his fracture, it is simply not the type of procedure which can give rise to a cause of action for medical battery.[9]

---

[9] The undersigned was unable to find a lack of informed consent case with similar facts. However, the undersigned finds that a closed reduction of a fracture is analogous to a chiropractic manipulation, which is considered a non-surgical procedure under Pennsylvania law. See Matukonis v. Trainer, 657 A.2d 1314 (1995) (doctrine of informed consent inapplicable to chiropractic manipulation of patient's neck, as it was not surgical in nature).

### d.  **Intentional Infliction of Emotional Distress**

Finally, Plaintiff brings another state law claim of intentional infliction of emotional distress against both Dr. Park and Dr. Jin for their "extreme and outrageous conduct" relating to his medical care for his broken bone.  (ECF No. 6, ¶¶ 195, 196.)

The Pennsylvania Supreme Court has never expressly recognized the tort of intentional infliction of emotional distress, but the Pennsylvania Superior Court has held that such a claim will lie where "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another."  Wilder v. United States, 230 F.Supp.2d 648 (E.D. Pa 2002) (citing Atamian v. Assadzadeh, 2002 WL 538977 (E.D. Pa. Apr. 9, 2001) (quoting Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 177 (Pa. Super. 1996) and Restatement (Second) of Torts, § 46)).  "Extreme and outrageous" conduct is "conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Atamian, 2002 WL 538977, at *5. Generally, the case must be one with respect to which "the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  Id. (citing Kazatsky v. King David Memorial Park, 527 A.2d 988, 994-95 (Pa. 1987)).  A plaintiff must also establish physical injury or harm.  See id.  Finally, in order to recover on a claim of intentional infliction of emotional distress, the plaintiff must prove the existence of the alleged emotional distress by "competent medical evidence."  Id. (holding that the plaintiff's recovery was barred by their failure to present competent medical evidence of their alleged emotional distress).[10]

---

[10] The Supreme Court of Pennsylvania stated that "[g]iven the advanced state of medical science, it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually

Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have . . . presented only the most egregious conduct. *See*, *e.g.*, <u>Papieves v. Lawrence</u>, 263 A.2d 118 (Pa. 1970) (defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents); <u>Banyas v. Lower Bucks Hospital</u>, 437 A.2d 1236 (Pa. Super. Ct. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); <u>Chuy v. Philadelphia Eagles Football Club</u>, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

The Complaint does not demonstrate actions indicative of the elements of this tort. Simply put, the Defendants alleged actions were not beyond all possible bounds of decency so as to be regarded as atrocious. In fact, Plaintiff's allegations show just the opposite. Even though Plaintiff believes that his medical providers' assessment was incorrect, this does not render Defendants' conduct reckless, extreme, or outrageous. Therefore, Defendants are entitled to summary judgment on this claim.

## III.    <u>CONCLUSION</u>

For the aforementioned reasons, it is respectfully recommended that the Motion for Summary Judgment filed by Defendants Grego, Medvec, Miller, Mitchell, and Vihlidal (ECF No. 41) and the Motion for Summary Judgment filed by Defendants Drs. Jin and Park (ECF No. 48) be granted.

---

suffered the claimed distress." <u>Kazatsky</u>, 527 A.2d at 995. This requirement is meant to ensure that claims for emotional distress rest on some "objective proof." <u>Id</u>.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, Plaintiff shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto.  Plaintiff's failure to file timely objections will constitute a waiver of his appellate rights.

Dated:  November 14, 2016.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge

Cc:     Jamar Wilson
        JM8436
        175 Progress Drive
        Waynesburg, PA  15370

        Counsel of record
        *Via CM/ECF electronic mail*